**Kathleen C. INDA and Kathleen F. Moritz, Plaintiffs,**

v.

**UNITED AIR LINES, INC. and Air Line Pilots Association, International, Defendants.**

**No. C-72-1890 SW.**

United States District Court, N. D. California.

Jan. 30, 1975.

Carole A. Hughes, San Francisco, Cal., for plaintiffs.

Donald D. Connors, Jr., Brobeck, Phleger & Harrison, San Francisco, Cal., for United Air Lines.

James C. Paras, Raymond L. Wheeler, Morrison, Foerster, Holloway, Clinton & Clark, San Francisco, Cal., Robert S. Savelson, Stephen B. Moldof, Cohen, Weiss & Simon, New York City, for defendant Air Line Pilots Ass'n International.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

SPENCER WILLIAMS, District Judge.

## I. *Findings of Fact*

### A. *Liability*

1. Until November 8, 1968, defendant United Air Lines, Inc. (hereinafter referred to as "United") maintained a policy which required female flight attendants to resign or to suffer discharge upon marriage. That policy did not extend to male flight attendants.

2. Plaintiff Kathleen C. Inda (hereinafter referred to as "Inda") worked for United as a flight cabin attendant from December 29, 1965 until June 15, 1968, at which time she resigned her employment.

3. Inda, at the time of her resignation, wished to continue her employment as a flight cabin attendant with United. However, she had made plans to be married on June 29, 1968, and, in fact, was married on that date. Inda was aware of United's policy of requiring female flight cabin attendants to retire from that position upon marriage, and her sole reason for resigning was her belief that she was compelled to do so by United.

4. After resigning, Inda worked for United as a clerk, a non-flight position, at United's San Francisco Maintenance Base from August 1968 through August 1969.

5. Inda transferred to said clerk position, for the most part, to maintain her company seniority with United.

6. Plaintiff Kathleen F. Moritz (hereinafter referred to as "Moritz") worked for United as a flight cabin attendant from February 9, 1966 to March 5, 1968, at which time she submitted her resignation.

7. Moritz, at the time of her resignation, wished to continue her employment as a flight cabin attendant with United. However, she had made plans to be married on March 30, 1968, and in fact, was married on said date.

8. Moritz was aware of United's policy of requiring female flight cabin attendants to retire from that position upon marriage, and her sole reason for resigning was her belief that she was compelled to do so by United.

9. On November 7, 1968, by letter of agreement, United entered into a collective bargaining agreement with the Air Line Pilots Association which contained a procedure for the adjustment of grievances and provided in pertinent part:

". . . that marriage will not disqualify a Stewardess from continuing in the employ of the Company as a Stewardess . . .."

"All Stewardesses who have been terminated by the Company because of marriage and have filed a valid grievance protesting such policy, or who have as of this date filed a valid

complaint before the Equal Employment Opportunity Commission or State Agencies, will be offered the opportunity to return to active Stewardess service. Such Stewardesses shall make application for reinstatement with no loss of seniority to the Director of Stewardess Service within thirty (30) days of receipt of such notification from the Company of such offer."

10. Insofar as the procedure for the adjustment of grievances precluded the rehiring of former United female flight cabin attendants who, as a result of United's "no-marriage" rule, had resigned before November 7, 1968 and had not previously filed a valid complaint before the Equal Employment Opportunity Commission or State Agencies, United still maintained an employment policy and practice of refusing to hire married women, as opposed to married men, as flight cabin attendants.

11. Upon hearing of the change of policy effected by the letter of agreement of November 7, 1968, Inda sought orally on or about November 7 or 8 of 1968 and in writing on November 14, 1968, to be transferred from her non-flight position and re-employed as a flight cabin attendant.

12. United denied Inda's request to be re-employed as a flight cabin attendant on or about November 18, 1968.

13. On November 18, 1968 Inda filed charges of sex discrimination with the Equal Employment Opportunity Commission.

14. The Equal Employment Opportunity Commission rendered a decision in December 1970, finding that there was probable cause to believe that United had violated Inda's rights on the basis of her sex. On October 16, 1972 the Equal Employment Opportunity Commission furnished Inda a ninety (90) day letter authorizing her to sue in the United States District Court.

15. Inda filed this action on October 18, 1972.

16. On or about November 8 or 9 of 1968, upon learning of United's agreement with the Air Line Pilots Association, Moritz asked Sue Husted, a United stewardess supervisor, for re-employment as a flight cabin attendant. Said request was denied.

17. On or about November 13, 1968 Moritz filed charges of sex discrimination with the Equal Employment Opportunity Commission.

18. The Equal Employment Opportunity Commission rendered a decision in December 1970, finding that there was probable cause to believe that United had violated Moritz's rights on the basis of her sex. On October 16, 1972 the Equal Employment Opportunity Commission furnished Moritz a ninety (90) day letter authorizing her to sue in the United States District Court.

19. Moritz filed this action on October 18, 1972.

20. United's policy of refusing to hire or rehire married women as flight cabin attendants was the only reason Inda and Moritz were denied reinstatement by United; both plaintiffs were otherwise qualified for employment as flight cabin attendants.

B. *Damages: Herein of Earnings and Benefits*

1. From the time of plaintiffs' original employment by United to the time of their resignations, stewardesses employed by United were paid a monthly salary based on 70 hours of flying per month, plus an hourly incentive rate for all hours flown in that month over 70 hours and up to 85 hours.

2. Effective April 1, 1973, the monthly salary for stewardesses was based on 67 hours of flying, and that was reduced to 65 hours of flying effective August 1, 1973.

3. The amount of time flown monthly was largely determined at each flight domicile by the flight schedules awarded to the stewardesses pursuant to monthly bidding.

4. The stewardesses who possessed greater seniority were given preferential treatment in the awarding of flight schedules, and the flights bid for varied in a number of respects, including the amount of time involved, the flight times, and the departure and arrival locations.

5. At the time of their resignations both plaintiffs bid primarily for flights with more time and for the locations that they desired.

6. Both plaintiffs were domiciled at San Francisco at the time of their terminations.

7. During plaintiffs' respective back-pay claim periods, the monthly base pay for the minimum required flying hours for stewardesses with the seniority plaintiffs would have enjoyed but for their resignations is as follows:

| March 1, 1968 | $400.00 |
|---|---|
| October 1, 1968 | 410.00 |
| January 1, 1969 | 435.00 |
| October 1, 1969 | 495.00 |
| January 1, 1970 | 525.00 |
| October 1, 1970 | 570.00 |
| January 1, 1971 | 590.00 |
| October 1, 1971 | 649.00 |
| January 1, 1972 | 676.50 |
| January 1, 1973 | 693.00 |
| October 1, 1973 | 738.00 |
| January 1, 1974 | 764.50 |
| May 1, 1974 | 817.00 |

8. United's records of yearly earnings for those eight to ten stewardesses who had seniority immediately preceding or subsequent to that which plaintiffs would have had indicate yearly average earnings as follows:

| | INDA | MORITZ |
|---|---|---|
| 1968 | $6,038 | $5,963 |
| 1969 | 6,896 | 6,599 |
| 1970 | 8,285 | 7,808 |
| 1971 | 8,633 | 8,636 |
| 1972 | 9,857 | 9,980 |
| 1973 | 10,289 | 9,884 |

9. United's records indicate that plaintiff Moritz, prior to her termination on March 5, 1968, had earned $1,789.20 in 1968. This sum included December 1967 earnings and thus represented earnings of $131.56 per week. Had Moritz continued to be employed throughout 1968, earning at the same rate, her yearly earnings for 1968 would have been $6,841.12.

10. United's records indicate that plaintiff Inda earned a total of $5,401.-39 in 1968 from employment both as a stewardess until June 15, 1968 and as a clerk commencing in August.

11. In order to determine plaintiff Inda's earnings as a stewardess at the time of her termination in 1968, it is necessary to segregate from her total 1968 earnings the remuneration she earned on account of her non-flight clerk position.

12. United's records reflect Inda's total earnings in 1969, solely from her employment as a clerk, of $2,899.38, or $322.15 per month for nine (9) months as her December 1968 earnings were included in the $2,899.38 total.

13. Using this monthly rate of pay for the four months of her non-flight employment in 1968, it is seen that Inda earned $1,288.60 from said employment and $4,112.79 in her capacity as a flight cabin attendant. On a monthly basis Inda earned $587.54 as a flight cabin attendant in 1968. Thus, had Inda continued to be employed as a flight cabin attendant throughout 1968, her total yearly earnings would have been $7,050.-48.

14. In addition to salary, United provided a stewardess during the backpay claim periods here involved with the following benefits:

a) free flight passes for herself and her immediate family;

b) substantial allowances for meals, lodging and transportation to and from the airport at layover stations;

c) replacement of all uniforms and insignia due to normal wear and tear or a major style change;

d) accident/sickness, dental and life insurance coverage;

e) effective June 1972, a retirement plan which required no employee contribution.

C. *Damages: Herein of Amounts Earnable Within the Claims Period With Reasonable Diligence*

1. The requirements, perquisites and substance of the stewardess position are amply set forth in John E. Courtright's affidavit filed by plaintiffs herein as Exhibit No. 9. In that affidavit Mr. Courtright, United's Director of In-Flight Services in 1969, characterized the job as a "unique one, different from all others in terms of objectives, qualifications, duties and working conditions." *Sprogis v. United Air Lines, Inc.*, Civil No. 68–C–2311 (N.D.Ill.1974) (Affidavit of J. E. Courtright, ¶ 5).

2. As compared with non-flight jobs, such as maintenance base clerk, the stewardess, among other things, earned approximately twice as much per hour; had a substantial range of choices including where, when, with whom, and how much she would work; could arrange her schedule to allow blocks of time off; enjoyed perquisites such as substantial allowances for meals, free transportation, hotels; and enjoyed the benefits of union representation, seniority rights and the rights to file grievances.

*Plaintiff Moritz:*

3. In addition to high school, plaintiff Moritz's education included a semester of college at Harris Teacher's College in St. Louis, Missouri.

4. Prior to her employment as a flight cabin attendant with United, plaintiff Moritz had worked in St. Louis for a year as a clerk-typist for the telephone company, and two years as a clerk-typist and relief receptionist for an architectural firm.

5. She left that employment in January of 1966 to become a United stewardess, and worked in that position until March 5, 1968, when she resigned because of United's "no-marriage" rule.

6. From the summer of 1968 through May of 1969 Moritz sought employment as a flight cabin attendant with several airlines including Universal Airlines, World Airways, Trans International Airlines, Air California, Holiday and Flying Tiger. She had also attempted to be rehired by United in November of 1968.

7. All of these attempts were unsuccessful because Moritz was married and the airlines' industry-wide policy prohibited the hiring of married women as flight cabin attendants.

8. From November of 1968 to May of 1969, Moritz was registered with the California Department of Human Resources Development (hereinafter referred to as "HRD"), and collected approximately $1,440.00 in unemployment compensation benefits.

9. Throughout this period HRD referred Moritz to only one job—as a flight cabin attendant with a private charter airline.

10. Moritz accepted this job and worked from approximately May to August, 1969, when said charter airline went bankrupt and the owner-operator disappeared without paying Moritz any of the salary due her.

11. After the annulment of her marriage in May 1970, Moritz, who was then living in the Los Angeles area, again unsuccessfully sought employment as a flight cabin attendant with several airlines including American, Western, TWA and United.

12. Moritz also attempted to find employment in other capacities through an employment agency in Los Angeles. Said agency found her clerical and typing skills too poor to refer her to any such office jobs.

13. Moritz remarried in February of 1971.

14. In September of 1971, Moritz was informed by EEOC that said agency had determined that her charge of sex discrimination against United was well-founded, and said agency would attempt conciliation with United on her behalf.

15. As a result of this notification Moritz was under the mistaken notion that she would shortly be reinstated as a flight cabin attendant with United and

therefore ceased pursuing further employment opportunities.

*Plaintiff Inda:*

16. In addition to her formal high school education, plaintiff Inda attended Nevada Southern University at Las Vegas for nearly two years as a technical theatre major.

17. Prior to her employment as a flight cabin attendant for United, plaintiff Inda worked as a checker for Vegas Village, a large discount house in Las Vegas, Nevada.

18. She left that employment in November 1965, to become a United stewardess, and worked continuously in that capacity until June of 1968 when she submitted her resignation in accordance with United's "no-marriage" rule.

19. After her termination, Inda worked in a ground position with United as a clerk at the San Francisco Maintenance Base from August 1968 through August 1969, at a salary of $322.15 per month.

20. Plaintiff Inda was dissatisfied with this position because it did not allow her a chance to fly, to use any of her qualifications and training in public contact work, or any choice in her hours or amount of work. In addition, the pay was substantially less than the salary Inda had made as a flight cabin attendant.

21. Plaintiff Inda unsuccessfully attempted transfer to another position with United that would utilize her public service training and experience. She was informed that it would take her fifteen years of company seniority for her to become either a hostess in United's Red Carpet Room, a passenger service representative or even to be a ticket agent in United's Redwood City office. Inda resigned her employment as a clerk in August 1969.

22. During the summer of 1969, both prior to and after her resignation of her clerk position, Inda sought employment as a flight cabin attendant with several airlines including Quantas, TWA, American, Pacific, BDAC, Pan American, National, Delta and Air West.

23. All of these attempts were unsuccessful because Inda was married and the airlines industry-wide policy prohibited the hiring of married women as flight cabin attendants.

24. In addition, at Quantas Airlines Inda unsuccessfully attempted to obtain employment as a passenger service representative.

25. Thereafter plaintiff Inda relied on employment advertisements in the newspapers to unearth possible employment which appeared interesting, entailed satisfactory remuneration and afforded her some freedom in choosing her hours of employment. Upon investigating those advertised job opportunities which seemed to offer the desired employment perquisites, Inda discovered that she was either unqualified, that the job did not exist, or she was simply not hired.

26. In September of 1971, Inda was informed by EEOC that said agency had determined that her charge of sex discrimination against United was well-founded, and said agency would attempt conciliation with United on her behalf.

27. As a result of this notification Inda mistakenly felt that she would shortly be reinstated as a flight cabin attendant with United, and therefore ceased pursuing any other substitute employment.

28. Plaintiff Inda's son was born April 10, 1972, and she is at this time nine months pregnant.

## II. *Conclusions of Law*

### A. *As to Liability*

1. This Court has jurisdiction over the parties and the subject matter hereof.

2. The rule, regulation or policy of United which required female flight attendants to resign or to suffer discharge upon marriage is unlawful as in violation of Title VII of the Civil

Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

■ 3. United's modification of its "no-marriage" policy (said policy having been referred to in paragraph 2 of Conclusions of Law, *supra*) by letter of agreement dated November 7, 1968 between United and the Air Line Pilots Association carried forward the consequences of United's past discriminatory policies. Application of this modified "no-marriage" policy still denied plaintiffs employment or reinstatement as flight cabin attendants solely because they were female and married, and was thus discriminatory and in violation of 42 U.S.C. § 2000e *et seq.*

■ 4. The resignations of Inda and Moritz, and each of them, were caused by United's discriminatory policies, and thus the result of unfair employment practices in violation of 42 U.S.C. § 2000e *et seq.*

■ 5. The discharge violations found in paragraph 4, *supra,* had continuing discriminatory effects, and each day that plaintiffs remained unemployed by United thereafter constituted a day in which United violated 42 U.S.C. § 2000e *et seq.* as to each plaintiff.

6. United's refusal to rehire Inda on November 18, 1968, constituted an act of discrimination in violation of 42 U.S.C. § 2000e, *et seq.*

7. United's refusal to rehire Moritz on November 8 or 9, and again on November 14, constituted acts of discrimination in violation of 42 U.S.C. § 2000e *et seq.*

■ 8. Plaintiffs Inda and Moritz have sustained their burdens of proof by establishing that the preponderance of evidence shows:

a) their original resignations from United as flight cabin attendants were substantially caused by United's discriminatory "no-marriage" policy; and

b) United's refusal to rehire or reinstate plaintiffs in November 1968 was motivated solely by an illegal and discriminatory policy in violation of 42 U.S.C. § 2000e *et seq.*

9. Inda filed sex discrimination charges with the Equal Employment Opportunity Commission within 90 days subsequent to acts of discrimination against her by United.

10. Moritz filed sex discrimination charges with the Equal Employment Opportunity Commission within 90 days subsequent to acts of discrimination against her by United.

### B. *As to Damages*

■ 11. In order to effectuate the purposes underlying Title VII of the Civil Rights Act, back pay is properly awarded to an aggrieved person found to have been discriminated against in violation of said Title. An award of back pay has been recognized as not a "mere adjunct of some more basic equity" but as an "integral part of the whole relief which seeks, not to punish the [defendant] but to compensate the victim of discrimination." *Pettway v. American Cast Iron Co.,* 494 F.2d 211, 252 (5th Cir. 1974).

12. The amount of damages permissibly awarded here is controlled by Section 706(g) of the Civil Rights Act, 42 U.S.C. § 2000e–5(g), which provides in part:

"If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin . . . such . . . practice, and order such affirmative action as may be appropriate, which may include . . . reinstatement or hiring of employees, with or without back pay . . . or any other equitable relief as the court deems appropriate."

■ 13. Since this Court has determined that plaintiffs have sustained economic loss from defendant's discriminatory employment practices, back pay should be awarded unless special circumstances are demonstrated. No special

circumstances are present here. *Pettway, supra,* at 252–53.

14. Plaintiff Inda's back pay claim period commenced on June 15, 1968 and, save her two pregnancies, continues uninterrupted until she is reinstated under the terms and conditions of this order. Plaintiff Moritz's back pay claim period began on March 5, 1968 and likewise continues until she is reinstated in accordance with this order.

15. Although counsel for plaintiff Inda intimated that Inda's two pregnancies probably would not have occurred had she been employed as a flight cabin attendant at the time, no testimony was elicited to corroborate such a conclusion.

16. In any event, the facts are that Inda did become pregnant, that her pregnancies were voluntarily planned and not just accidents or casual illnesses, and that her pregnancies would have rendered her unavailable for service as an airline stewardess at some point even if the opportunity to work had been open to her.

17. Hence, it is the opinion of this Court that Inda's claim period referred to in paragraph 14, *supra,* was interrupted by her two pregnancies for the number of months specified in plaintiffs' trial exhibit number 11, *to wit,* 8.3 months for Inda's first pregnancy and, to the extent that the damages provided for in this order seek to make Inda whole through December 1974, 5.3 months for her second pregnancy. In short, United is entitled to a reduction in its back pay liability by reason of Inda's two pregnancies.

18. Title VII provides that, "Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable." 42 U.S.C. § 2000e–5(g).

19. This "mitigation" provision is in accord with and is interpreted in light of the common law measures of damages for breach of contract of employment and the practice under the National Labor Relations Act. *Ochoa v. American Oil Co.,* 338 F.Supp. 914, 919 (S.D.Tex.1972); *Pettway, supra,* at 252.

20. The burden is on defendant United to show interim earnings or amounts earnable with reasonable diligence by plaintiffs. *Hegler v. Board of Educ.,* 447 F.2d 1078, 1081 (8th Cir. 1971); *Rolfe v. County Bd. of Educ.,* 391 F.2d 77, 81 (6th Cir. 1968); *N.L. R.B. v. Madison Courier, Inc.,* 153 U.S. App.D.C. 232, 472 F.2d 1307, 1318 (1972).

21. Defendant, contending that it does not carry the burden but that the burden rests on plaintiffs, made little or no effort to meet it. Plaintiffs, although asserting that the burden was defendant's, made an adequate showing that plaintiffs used reasonable diligence to find other suitable, similar or substantially similar employment.

22. Defendant argued that Inda's and Moritz's applications to other airlines for employment as flight cabin attendants did not evince conduct reasonably calculated to procure other employment since they knew of the industry-wide proscription against hiring married stewardesses. This is a most specious contention. To subscribe to defendant's argument would be in effect condoning not only isolated employment discrimination by individual employers, but wholesale discrimination on an industry-wide basis. In essence, defendant would have this Court permit discriminating employers to escape full Title VII liability by merely pointing to the fact that substantially similar employment could never be found since all employers in the same field followed the identical discriminatory practices. This Court will not countenance such a result, for no person should be allowed to profit from his or her wrong merely because he or she happens to share in its perpetration.

23. Apart from the matter of available stewardess jobs at other airlines, defendant contends that plaintiffs made inadequate efforts to find employment in the San Francisco area.

24. As was noted above (paragraph 20), it has long been well established that in damage claims for what was here, in effect, a wrongful discharge, the burden is upon the employer to show that the employees did not act reasonably to procure other employment.

25. Although plaintiffs' efforts in seeking substitute similar employment cannot be characterized as overwhelming, there is substantial evidence in the record showing that they did pursue other employment and did so in a reasonably diligent fashion.

 26. This Court concludes that defendant United has failed to show that there were substantially similar jobs available to plaintiffs Moritz and Inda which they could have discovered and for which they were qualified.

27. Plaintiffs Moritz and Inda have shown that they exercised reasonable diligence to find substantially similar employment during the back pay claim period, but that no such employment was available to them.

28. State unemployment compensation benefits are made to carry out an independent social policy and are, therefore, not to be considered "interim earnings" deductible from a discriminatee's back pay award. *Tidwell v. American Oil Co.*, 332 F.Supp. 424, 437–38 (D.Utah 1971). As such, the $1,440.00 in unemployment compensation benefits received by plaintiff Moritz are not to be deducted from her back pay award.

29. Therefore, pursuant to 42 U.S.C. § 2000e–5(g), United is liable to plaintiffs Moritz and Inda for the following amounts of back pay damages:

| | INDA | MORITZ |
|---|---|---|
| 1968 | $ 1,64ᶜ | $5,052 |
| 1969 | 3,997 | 6,599 |
| 1970 | 8,285 | 7,808 |
| 1971 | 8,633 | 8,636 |
| 1972 | 9,857 | 9,980 |
| 1973 | 10,289 | 9,884 |
| 1974 | 10,289 | 9,884 |
| less (1971–72 maternity) | −6,538 | |
| less (1974 maternity) | −4,544 | |
| TOTALS | $41,917 | $57,843 |

30. United is liable to plaintiffs for pre-judgment interest on the above back pay awards, at the rate of 6% per annum, to be calculated on a quarterly earnings basis.

31. United is further liable to plaintiffs for back pay in 1975 until such time as they are reinstated pursuant to this Court's order.

32. United is ordered to reinstate plaintiffs with full seniority from their respective dates of hire, with all of the employment rights and benefits to which they are entitled by virtue of said seniority, including restoration into United's retirement plan.

33. Jurisdiction is retained to determine the amount of attorney's fees and costs incurred in prosecuting this action.

It is so ordered.